# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-2660

_____

Joseph Murchison

*Plaintiff - Appellant*

v.

John Rogers; Terrena Ballinger; Greg Hadley; Warden Michael Bowersox; George Lombardi; Superintendent Dave Dormire

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: November 12, 2014
Filed: March 11, 2015

_____

Before BYE, SHEPHERD, and KELLY, Circuit Judges.

_____

BYE, Circuit Judge.

Joseph Murchison, a former prisoner in the South Central Correctional Center ("SCCC") in Licking, Missouri,[1] filed this action alleging prison officials violated his

_____

[1]On September 2, 2013, Murchison was transferred to the Northeast Correctional Center.

First Amendment rights when they censored his subscribed issue of *Newsweek* magazine. The district court[2] dismissed the claims against some of the prison officials and granted summary judgment in favor of the remaining prison officials. For the reasons set forth below, we affirm.

I

At the time of the events relevant to this dispute, Murchison was incarcerated at the SCCC. A subscriber of *Newsweek* for many years, Murchison received most of his issues of *Newsweek* at the SCCC without incident. On October 7, 2010, however, members of the SCCC's censorship committee (the "Committee"), John Rogers and Greg Hadley, censored the October 11, 2010, issue of *Newsweek* addressed to Murchison on the grounds that it "promotes violence, disorder or the violation of state or federal law including inflammatory material. (throughout) Pg. 32-34."[3]

SCCC prison regulations prohibited certain types of materials in the prison:

1. Offenders are prohibited from receiving correspondence, written or recorded materials, or pictures that:
   a. constitute a threat to the security, good order or [] discipline of the institution;
   b. may facilitate or encourage criminal activity;
   c. may interfere with the rehabilitation of an offender.
2. Correspondence, written or recorded materials or pictures are subject to being censored in compliance with III.C.1. if the item:

---

[2]The Honorable Greg Kays, Chief Judge, United States District Court for the Western District of Missouri.

[3]The Committee is tasked with reviewing incoming, outgoing, and impounded items and censoring any items not in compliance with prison regulations.

> a. promotes, incites, or advocates violence, disorder or the violation of state or federal law . . .

Missouri Dep't of Corr. Institutional Servs. Policy and Procedure Manual, IS13-1.2 Censorship Procedures, III.C. However, "[c]orrespondence, printed or recorded materials, and pictures may not be rejected because . . . the content is religious, philosophical, social, sexual, political or is unpopular or repugnant . . . ." Id. at III.B.2.

After the Committee notified Murchison that the *Newsweek* issue would be censored, he filed an Informal Resolution Request ("IRR") in which he asserted that censoring the magazine violated his constitutional rights. The IRR was denied on December 17, 2010. Murchison then filed a grievance with the Warden of the SCCC, Michael Bowersox, who denied the grievance. Murchison appealed to the Director of the Division of Adult Institutions, Dave Dormire, and the Director of the Missouri Department of Corrections, George Lombardi, through which he also received no relief.

On October 20, 2011, Murchison filed this 42 U.S.C. § 1983 action against several prison officials from the SCCC. Shortly thereafter, Bowersox, Lombardi, and Dormire filed motions to dismiss the claims against them on the ground that Murchison failed to allege they were personally involved in any alleged constitutional violations against him. Over Murchison's opposition, the district court granted the motion and dismissed these officials, finding they were not personally involved in censoring the *Newsweek* issue and could not be held liable under a respondeat superior claim under § 1983.

Murchison then proceeded with discovery on his remaining claims against Terrena Ballinger, Hadley, and Rogers (the members of the Committee). During the discovery phase of the litigation, Murchison's cell was searched and some materials,

including legal materials, were confiscated, reportedly because they were in violation of prison policy. Murchison filed several motions to stay the proceeding while he was in administrative segregation, all of which were denied. On April 1, 2013, the remaining prison officials filed a motion for summary judgment, which the district court granted, finding that censoring the *Newsweek* issue did not violate Murchison's First Amendment rights. The district court further concluded that the remaining defendants were entitled to qualified immunity. In the same order, the district court also denied Murchison's outstanding motion to compel, in part, because it was untimely.

Murchison now appeals the grant of summary judgment, the dismissal of Bowersox, Lombardi, and Dormire, and the denial of his motion to compel.

II

We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and giving the non-moving party the benefit of all reasonable inferences. Dowell v. Lincoln Cnty., Mo., 762 F.3d 770, 775 (8th Cir. 2014). Summary judgment is appropriate only if the moving party satisfies its burden of demonstrating that no genuine issues of material fact remain for trial. Fed. R. Civ. P. 56(a).

To be valid, "a prison regulation [which] impinges on inmates' constitutional rights . . . [must be] reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). This level of scrutiny ensures that "prison administrators, and not the courts, [] make the difficult judgments concerning institutional operations." Id. (internal quotation marks and alterations omitted). There are four relevant factors in determining the reasonableness of the regulation: (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are

alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; (4) and whether there exist alternatives to accommodate the prisoner with a *de minimis* cost. Id. at 89-91 (internal quotation marks omitted).

## A

We first consider whether there exists "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89 (internal quotation marks omitted). "[T]he governmental objective must be a legitimate and neutral one . . . without regard to the content of the expression." Id. at 90. However, courts must be deferential to the prison officials' views of what material may be inflammatory. See Murphy v. Missouri Dep't of Corr., 372 F.3d 979, 986 (8th Cir. 2004). As the Supreme Court has cautioned, "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of a prison." Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).

We have already held that "[a] regulation that allows for censorship of incoming items that are likely to incite violence is related to the institutional needs of maintaining a controlled and secure environment among the prison population." Murphy, 372 F.3d at 986; see also Dean v. Bowersox, 325 F. App'x 470, 472 (8th Cir. 2009). But a facially valid regulation "may be invalid if it is applied to the particular items in such a way that negates the legitimate concerns." Murphy, 372 F.3d at 986. Murchison does not challenge the prison regulations on their face but, rather, as applied to the censorship of this particular *Newsweek* issue.

In such an as-applied challenge, we consider "whether a ban on *these particular items* is reasonably related to a legitimate penological objective." Williams

v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997) (emphasis added). "Before the prison authorities censor materials, they must review the content of each particular item received." Murphy, 372 F.3d at 986. Importantly, though, "prison officials have broad discretion to censor or restrict an inmate's receipt of a publication to serve a legitimate penological interest–including the need for institutional security . . . ." Ivey v. Ashcroft, 62 F.3d 1421 (8th Cir. 1995) (unpublished). Thus, in our review, we must "recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment." Murphy, 372 F.3d at 986. Nevertheless, the court must conduct "'an independent review of the evidence' to determine if there has been 'an exaggerated response to prison concerns' in relation to this particular item." Id.; see also Kaden v. Slykhuis, 651 F.3d 966, 969 (8th Cir. 2011). "[S]ummary judgment [is] appropriate only if [the prison officials] present[] some specific evidence of why this particular item implicates prison concerns." Murphy, 372 F.3d at 986.

Murchison first argues summary judgment was improper because the *Newsweek* issue does not explicitly advocate for violence, disorder, or the violation of state and federal laws. At the heart of the censored material is an article entitled "Hiding Behind the Web," which discusses a blog, managed by a college student residing in Mexico, reporting on various issues surrounding the violence of the drug cartels in Mexico. The article includes two violent photographs, one showing two individuals hanging from a bridge and another showing the body of a murdered journalist lying on a street in a pool of blood. The article discusses and describes the violence and disorder in Mexico brought on by the drug cartels. In particular, it describes attacks by drug cartels against the government and military. While the article discusses the lack of meaningful reporting on drug cartels and organized crime in Mexico, it also describes and depicts their continued acts of violence and lack of respect for the law. Undoubtedly, the article's focus is on, and it depicts, disorder, violence, and the violation of law. Although the material, on its face, may not necessarily explicitly advocate for violence or the violation of law, this does not mean

-6-

it does not promote either. We do not mean to suggest that all materials discussing or depicting violence actually promote violence or the violation of law. However, in reviewing the prison officials' decision, we must be deferential. See, e.g., Murphy, 372 F.3d at 986 ("We recognize and defer to the expertise of prison officials on what is likely to be inflammatory . . . ."); Overton v. Bazzetta, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."); Hamilton v. Schriro, 74 F.3d 1545, 1553 (8th Cir. 1996); Ivey, 62 F.3d at 1421 ("[P]rison officials have broad discretion to censor or restrict an inmate's receipt of a publication to serve a legitimate penological interest–including the need for institutional security . . . ."); Murphy v. Missouri Dep't of Corr., 814 F.2d 1252, 1256 n.5 (8th Cir. 1987) (explaining that the district court properly gave deference to testimony from prison officials that the publications would cause safety concerns); Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998) (en banc) (explaining, in an as-applied challenge, that the court owed "great deference . . . to prison authorities in their administration of state prison systems"); Prison Legal News v. Livingston, 683 F.3d 201, 216 (5th Cir. 2012) ("It is, of course, extremely difficult for courts to judge whose assessment is more likely correct, which highlights the importance of the deference that is accorded to prison administrators applying reasonable policies."). Accordingly, after independently reviewing the material and deferring to the prison officials' expertise, we find their censorship of the *Newsweek* issue was reasonably related to a legitimate penological objective and was not an exaggerated response.

Next, relying on Murphy, Murchison argues the proffered reason for censorship is too conclusory and prison officials failed to put forth sufficient evidence that the *Newsweek* issue promotes violence, disorder, or the violation of state and federal law. In support of their motion for summary judgment, the prison officials provided specific evidence regarding the particular material that was censored. For instance, Rogers's affidavit provided that the materials include photos of "death and murder,"

"two men hanging from a bridge," "a dead man lying in a pool of blood," all of which in his experience "promote prison violence, disorder, or violations of law." Ballinger's affidavit explained that "prolonged exposure to violent acts, through print materials or other media, reinforces socially irresponsible behavior inside prisons." Furthermore, she explained that "print materials that demonstrate violent acts may be expected to circulate among prisoners . . . [and] can be used to threaten other inmates, as prison currency, or to identify gang affiliation."

Murchison's reliance on our decision in Murphy is misplaced. In Murphy, we held that material issues of fact remained as to whether the censorship of the publication at issue satisfied the Turner factors because the prison officials' "documented reason for censoring the item [was] too conclusory to support a judgment in its favor on this issue." 372 F.3d at 986. We therefore remanded to the district court but expressly noted the prison officials could introduce further evidence and again move for summary judgment. Id. More recently, however, in a similar type of challenge to censorship, we affirmed a district court's grant of summary judgment and rejection of the same arguments advanced here. In Dean, three inmates from the SCCC argued that prison officials' censorship of various publications because they promoted violence, disorder, or the violation of state or federal law violated their First Amendment rights. 325 F. App'x at 471. We initially partially affirmed but reversed the district court's dismissal of the as-applied challenge to the censorship. Id. On remand, the district court granted summary judgment in favor of the prison officials on the inmates' as-applied challenge to the censorship of 11 of the 61 publications at issue because they promoted violence, finding that they included images "portray[ing] blood spewing from humans or human-like creatures, humans shooting other humans, and humans or human-like creatures with bloody mouths, faces, or bodies" and that "[t]here is a rational connection between the bloody and weapon-laden images and [the prison officials'] interest in safety and security." Dean v. Bowersox, No. 07-CV-03298, at *19 (W.D. Mo. Aug. 29, 2013), aff'd, No. 13-3700, 2015 WL 405198, at *1 (8th Cir. Feb. 2, 2015). The district court also found the inmates had alternative

means to receive the information, the impact of accommodating their rights would be substantial and that there would be no easy alternative, such that the censorship was not an exaggerated response.  Id.  On the subsequent appeal, after carefully reviewing the record and the parties' supplemental briefing ordered by the court, we affirmed the district court.  See Dean v. Bowersox, No. 13-3700, 2015 WL 405198, at *1 (8th Cir. Feb. 2, 2015).

We find the circumstances of Dean more analogous to the circumstances in this case.  Here, prison officials provided evidence that they reviewed the content in the specific *Newsweek* issue and introduced testimony that this specific material would promote violence, disorder, or violations of law.  There is no suggestion the prison has a blanket ban on this specific publication or on any material which includes some type of violent content.  Accordingly, sufficient evidence exists in the record to support summary judgment.

Murchison also argues the prison officials failed to present evidence that the censored materials have ever *actually* caused any disruption at the SCCC.  However, prison officials need not wait until particular prohibited material causes harm before censoring it, so long as they have a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."  See Turner, 482 U.S. at 89 (internal quotation marks omitted).  Evidence of previous incidents from specific content may bolster the rationale for censorship but it is not necessary–prison officials may also seek to prevent harm that has yet to occur.  As we have previously explained, "Turner does not require 'actual proof that a legitimate interest will be furthered by the challenged policy,' only that the interest being served and the policy have an 'objectively rational' connection."  Ortiz v. Fort Dodge Corr. Facility, 368 F.3d 1024, 1027 (8th Cir. 2004) (quoting Herlein v. Higgins, 172 F.3d 1089, 1091 (8th Cir. 1999)).  Indeed, evidence "short of an actual incident" satisfies the "some evidence" requirement.  Fegans v. Norris, 537 F.3d 897, 904 (8th Cir. 2008); see also Prison Legal News, 683 F.3d at 216 ("[P]rison policies may be

legitimately based on prison administrators' reasonable assessment of *potential* dangers."). This exact argument was considered and rejected by the district court in <u>Dean</u>, which we affirmed on appeal. <u>Dean</u>, No. 07-CV-03298, at *18-19 (concluding that lack of evidence regarding specific incidents caused by the censored material was not determinative). We again hold that the interest advanced here was not dependent on a showing of previous harms based on the same material.

Finally, the mere fact that other similar materials depicting violence exist within the prison walls does not preclude summary judgment on the basis that this violent material violates prison regulations. The existence of similar material within the prison walls may serve to show inconsistencies in the manner in which material is censored such as to undermine the rationale for censorship or show it was actually censored for its content. Such "inconsistencies could become so significant that they amount to a practical randomness that destroys the relationship between a regulation and its legitimate penological objectives." <u>Prison Legal</u>, 683 F.3d at 221. Although Murchison has presented a few materials available in the prison which demonstrate at least some inconsistency in the manner of censoring such materials, in this case, we do not believe Murchison demonstrated inconsistencies that rise to a level of randomness or that undermine the rationale for censoring this particular item. With the volume of material that must be screened, we cannot expect prison officials to perfectly screen all material that violates prison regulations. Nor do we suggest that prison officials may categorically prohibit all materials which may contain some content involving violence. Thus, in the broad sense, it is not surprising that Murchison was able to produce some other materials discussing or depicting violence. Moreover, in the unique context specific articles may discuss or involve violent topics, it is difficult to analyze how much one article promotes violence or the violation of law compared to another, particularly in the unique context of a prison. As such, the court does not generally engage in a "one-to-one comparison[] of a few specific books." <u>Id.</u> Importantly, Murchison has not presented any evidence that the same issue of *Newsweek* was made available to anyone else in the prison. Therefore,

-10-

in this case, that some other violent material with similar content is available in the prison does not undermine the prison officials decision to censor this particular *Newsweek* issue. See <u>Dean</u>, No. 07-CV-03298, at *12, 14 (concluding that the existence of other similar items in the library and limited inconsistency did not preclude summary judgment); <u>Jones ADC #70147 v. Golden</u>, No. 5:10CV00068, 2011 WL 1480315, at *4 (E.D. Ark. Mar. 9, 2011) ("[A]lthough Mr. Jones provided the Court with examples of both publications and movies that were not confiscated or banned by the ADC, that does not create a genuine dispute of material fact in this case"), <u>adopted by</u> 2011 WL 1479987 (E.D. Ark. Apr. 19, 2011); <u>see also</u> <u>Hodgson v. Fabian</u>, 378 F. App'x 592, 594 (8th Cir. 2010) ("[S]ummary judgment is not defeated by a random misapplication of a reasonable regulation." (internal quotation marks omitted)); <u>Weiler</u>, 137 F.3d at 1050 (concluding that even if 100 inmates received mail the plaintiff was not allowed to receive, due to "a breakdown in mailroom procedures," the reasonableness of the regulations "would be no less constitutional").

For these reasons, we find the district court correctly concluded prison officials demonstrated a valid, rational connection between the censorship of the *Newsweek* issue and the prison officials' interest in prohibiting materials that promote violence, disorder or the violation of state or federal law.

B

We next consider whether Murchison has alternative means for exercising his First Amendment right. In evaluating this factor, "courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." <u>Turner</u>, 482 U.S. at 90 (internal quotation marks omitted). In considering this factor, "'the right' in question must be viewed sensibly and expansively." <u>Thornburgh</u>, 490 U.S. at 417. The question is not merely whether Murchison can read this particular article within this particular issue of

-11-

*Newsweek*. Indeed, if the test was whether Murchison could somehow otherwise obtain this specific article that has been considered a violation of prison regulations, it would render this factor meaningless; unless willing to permit inmates to possess contraband, inmates would never have alternative means of exercising the right.

The fact that Murchison particularly enjoys reading *Newsweek* does not mean that he cannot exercise his First Amendment right to read about drug cartels or free press issues in Mexico through other means. Indeed, by citing to other written and non-written materials with similar content available in the prison library, Murchison himself demonstrates that he is otherwise able to exercise his First Amendment rights. Because there is no suggestion that there is a blanket ban on *Newsweek* in the prison–to the contrary, he received all other issues–and there has been no suggestion that the specific content has been entirely banned, Murchison has alternative means to exercise his rights.

C

Under the third <u>Turner</u> factor, the court considers the impact the asserted constitutional right will have on prison resources. <u>Turner</u>, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." <u>Id.</u>

Murchison argues that there would be no "ripple effect" because other similar violent content is available; however, as already discussed, defendants presented specific evidence that this particular publication is likely to have a disruptive and disorderly effect on the prison. It is well recognized that outside publications may have significant effect in the prison population:

Once in the prison, [incoming publications] reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. Furthermore, prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accordingly.

Thornburgh, 490 U.S. at 412. We must also remember that "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of a prison." Id. at 407. Therefore, "[w]here . . . the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the informed discretion of corrections officials." Id. at 418 (internal quotations and citations omitted). Given the violent and disorderly content of the censored material involving murder and organized crime, we defer to the expertise and testimony of the prison officials regarding its potential impact in the prison.

D

The last factor we consider is whether there exist alternatives to accommodate Murchison at a *de minimis* cost. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner, 482 U.S. at 90. Importantly, the Supreme Court has rejected the notion of a "least restrictive alternative" and explained that "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. at 90-91. "But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91. "In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty

of others or on the use of the prison's limited resources for preserving institutional order." Salaam v. Lockhart, 905 F.2d 1168, 1171 (8th Cir. 1990).

Murchison argues that three *de minimis* alternatives exist: (1) creating a "reading room" for such material; (2) restricting the material by requiring inmates to sign it out; and (3) tearing out the specific article to allow him to view the remainder. Although perhaps reasonable, we do not believe any of these alternatives can be considered *de minimis*. First, creating a specific reading room would obviously "present administrative difficulty and cost" and cannot be characterized as *de minimis*. See Dawson v. Scurr, 986 F.2d 257, 261 (8th Cir. 1993); see also Kendrick v. Pope, 671 F.3d 686, 690 (8th Cir. 2012) (Colloton, J., concurring in part and dissenting in part) ("Accommodating [the prisoner] would require correctional officers to devote limited resources to monitoring a safety risk that the policy otherwise eliminates."); Mauro v. Arpaio, 188 F.3d 1054, 1062 (9th Cir. 1999) (holding that creation of a reading room would not be a *de minimis* alternative because it "would impose a significant administrative burden on the jail"). Second, allowing inmates to take the material by signing it out would in no way prevent dissemination in the prison, which would likely undermine the specific penological interests discussed above. It would almost certainly also require additional resources to manage and monitor the process of signing out the materials, ensure they remain only with the party who signed them out, and ensure they are timely returned. Even if signed out material needs to remain in the library, prison staff would need to dedicate additional resources to ensure that such materials are not removed. This, too, is not *de minimis*.

Murchison's final suggestion–to simply remove the prohibited material and allow the rest–at first blush has the most appeal. Tearing out specific pages of a specific publication containing prohibited material does not sound particularly difficult. Yet, when considered in the context of the review process for all incoming mail, the question becomes more complex. Prison policy provides that "[i]f part of

an item or mailing is prohibited, the entire item must be censored." Thus, prison officials cannot merely tear out the pages specific to Murchison's censored publication, they would have to do so for all incoming publications which include prohibited content. Murchison has not challenged, and we have an insufficient record to fully evaluate, whether the prison regulation of censoring an entire item based on a limited amount of content subject to censorship, on its face, is constitutional.

In Thornburgh, the Supreme Court found convincing the testimony from prison officials that "tearing out the rejected portions and admitting the rest of the publication would create more discontent than the current practice . . . ." 490 U.S. at 418-19. The Court reasoned that such a practice would cause "administrative inconvenience" and that prison officials demonstrated a likelihood of greater harm. Id. at 419. In the context of this as-applied challenge, we believe requiring such a change would have more than a *de minimis* impact. See Dean, No. 07-CV-03298, at *11, 14, 15 (concluding that removal of free items or tearing out pages from publications would be impractical based on volume of incoming mail and would constitute a more than *de minimis* burden); see also Lindell v. McCaughtry, 115 F. App'x 872, 879 (7th Cir. 2004) (citing Thornburgh and explaining that the court was "unwilling to say that the DOC should be required to redact publications when the Supreme Court approved the Federal Bureau of Prisons' retention of the 'all-or-nothing' rule, which bans the entire publication if anything is found that may threaten security and order"); McCormick v. Werholtz, No. 07-2605, 2009 WL 5210845, at *7 (D. Kan. Dec. 23, 2009) (holding, for an as-applied challenge, that this was not a *de minimis* alternative measure because to make such accommodation for all inmates would "require an enormous additional expenditure of resources"). For instance, reviewing officials would likely be required to more closely review each page of each publication, perhaps even excising portions of a particular page. There may also be issues related to the documentation and storage of any excised materials. We do not attempt hypothetically to decide in the abstract where such a line may be drawn. Keeping in mind that prison officials need not adopt the least restrictive

-15-

means, in the context of this as-applied challenge, we do not believe tearing out the prohibited material would be a *de minimis* alternative.

For all of these reasons, we find the district court properly granted summary judgment in favor of the prison officials. Because there was no constitutional violation and Murchison cannot succeed on his claim, the prison officials were also entitled to qualified immunity, and we need not address whether the district court erred in dismissing the supervisory prison officials.

## III

Murchison also argues the district court erred in denying his untimely motion to compel discovery. We review such motions for a gross abuse of discretion. See Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1052 (8th Cir. 2007).

Murchison asserts the district court abused its discretion in denying the motion because he was in administrative confinement during some of the time for discovery. However, he does not assert that he was unable to file legal materials while in administrative confinement–indeed Murchison filed numerous motions during the time he was in administrative confinement. The record shows Murchison was able to communicate with the district court and had some access to his legal materials, albeit not to the extent he desired. Most importantly, Murchison fails to articulate any discovery he believes would demonstrate a genuine issue of material fact such as to avoid what we conclude was a proper grant of summary judgment. The only discovery he specifically mentions is related to whether any evidence exists of such material causing disturbances in the prison. However, as explained above, even a complete absence of such evidence does not preclude summary judgment. Because Murchison cannot demonstrate that the denial of the untimely motion deprived him of the opportunity to fairly respond to the motion for summary judgment, we find no abuse of discretion. Cf. Ballard v. Heineman, 548 F.3d 1132, 1136 (8th Cir. 2008)

-16-

("The district court does not abuse its discretion by denying further discovery 'where the nonmoving party is not deprived of a fair chance to respond to the summary judgment motion.'").

IV

We affirm the judgment of the district court.

_____