# IN THE COURT OF APPEALS OF IOWA

No. 15-0264
Filed October 12, 2016

**KRISTINE SINK,**
        Plaintiff-Appellant,

**vs.**

**STATE of IOWA and**
**IOWA DEPARTMENT OF CORRECTIONS,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell,

Judge.


        Plaintiff appeals from a jury verdict denying her claim of sexual

harassment and the summary judgment ruling against her on her claim of

retaliation.  **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

**FOR NEW TRIAL.**


        Emily E. McCarty and Paige E. Fiedler of Fiedler & Timmer, P.L.L.C.,

Urbandale, for appellant.

        Thomas J. Miller, Attorney General, and Tyler M. Smith, Julia S. Kim, and

Anne E. Updegraff, Assistant Attorneys General, for appellee State.


        Heard by Danilson, C.J., Tabor, J., and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**MAHAN, Senior Judge.**

Kristine Sink appeals from a jury verdict in favor of her employer, the Iowa Department of Corrections (DOC), on her claim of sexual harassment. Sink also appeals the summary judgment entered against her on her retaliation claim.

## I. Background Facts and Proceedings

Sink began working as a correctional officer for the DOC at the Iowa State Penitentiary (ISP) in Fort Madison in May 2003. ISP is a maximum-security, all-male prison. Sink was assigned to the Clinical Care Unit (CCU), in which inmates with mental illness and/or severe behavioral problems were housed. Many of the inmates she supervised were sex offenders. The record makes clear that working in the CCU at ISP is a demanding job. Inmates engage in public masturbation and intercourse. Inmates throw feces, urine, and blood at correctional officers. Correctional officers are exposed to possible assaultive behavior.

Inmates are allowed to watch television and movies. There is a common television in the CCU. Access to television is used as a behavioral incentive for inmates. ISP may grant or revoke television privileges as it sees fit.

In late 2003, Sink observed a movie on the common CCU television depicting graphic sexual conduct. Several of the inmates, perhaps incited by the programming, began to make lewd comments directed towards her. Sink turned off the television and reported what had happened to her supervisor. The movie was not shown again. However, other movies Sink found objectionable were subsequently shown. Over the years, Sink would often report questionable

content to her supervisor and attempt to bring up the subject at weekly steering committee meetings. She was finally told by the warden it was a "dead issue."

In January 2007, Sink complained in writing. She did not receive a response. She circulated proposed guidelines for movie selection by email to DOC management. Her guidelines were not implemented. On February 19, 2007, Sink filed a formal complaint alleging workplace violence with the DOC regarding the movies. In response, management considered showing no film with a rating above PG-13 and implementing a movie review committee to screen potential films. The next day, Sink informed the warden the inmates had learned of her complaint and were upset she was trying to "take their movies away from them." The warden responded unsympathetically.

In March 2007, a movie review committee was formed to screen R-rated films. The warden dismissed Sink's workplace-violence complaint. The movies did not cease, however, and in August 2007, Sink filed another workplace-violence complaint. ISP dismissed Sink's complaint and implemented additional procedures to address her concerns.

On May 31, 2011, Sink filed a written complaint about two movies. It is unclear if any substantive response came about. In August 2011, Sink again turned off an offending television show. She was instructed to turn on the television.[1] In September 2011, Sink filed another formal written complaint about a television show and a movie that had been shown. An administrator for the DOC reviewed the two and agreed with Sink. As a result, the DOC issued a

---

[1] Emails and testimony from ISP management suggest that correctional officers were not authorized to turn off movies that had been approved for viewing. ISP's associate warden for security, Deb Nichols, also testified turning off movies presented a security risk, because inmates could become violent if a program was interrupted.

statewide directive reiterating that all NC-17 movies were banned, as were R-rated movies without "redeeming value" and warden approval. ISP's warden ordered that all movies rated R due to sexual content be pulled pending his approval. The ISP management team responded to any inmate who asked about the new movie policy that ISP had shown some unapproved movies and would be correcting that problem. At a monthly offender council, inmates were told the same and that "no one but [ISP] made the mistake and had anything to do with the movies," according to Nichols.

Nichols expressed concern for Sink's safety following this order. Sink was offered another post at a separate entity located behind ISP, the John Bennett Unit (JBU), which houses lower-risk inmates serving short-term sentences. Sink declined the move.

ISP then showed inmates several animated children's movies and television shows. Sadly, it became clear Nichols' concern for Sink's safety was well-founded. Sink was the subject of several threats from inmates who believed the new programming was demeaning and Sink was to blame. Nichols testified she received a note from an inmate threatening to rape Sink and that inmates were making oral threats to rape or kill Sink. In November 2011, an angry inmate threw urine at Sink. That inmate was disciplined and moved to another area of the prison.

Another inmate whom ISP held from September 2011 to June 2012 acted inappropriately towards Sink. He wrote Sink several explicit notes describing sexual acts he would like to perform with her. He claimed to have ejaculated on one of these notes he gave to Sink. Some notes were in the shape of a penis.

He made sexual comments to Sink.  Sink complained to a supervisor.  The supervisor commented to Sink that she was a beautiful woman and if he were an inmate, he would try to "get with" Sink too.

Another inmate told a counselor he was having thoughts about assaulting Sink.  The counselor alerted Sink.  The same inmate had attempted to sexually assault and kill a female correctional officer at another facility.  In March 2012, Sink found the inmate in a cell with his pants and underwear around his ankles and his penis in his hand.  Sink was able to subdue the inmate without further incident.  Sink asked for this inmate to be moved off her unit, but her request was denied.  She then complained to her supervisor, who repeated his belief that Sink should have known what she was getting into when she applied for her job.

Sink had other issues with coworkers.  Her partner, Aaron Freeman, read aloud articles and jokes from Playboy magazine to inmates.  Freeman also displayed inappropriate material of a sexual nature on his computer, which was visible to Sink.  Sink also discovered in a dumbwaiter a toilet paper roll wrapped around a banana positioned upright, with a note stating, "Bring back any memories, whore?"  Another coworker, Joshua Wilcox, had placed the item in the dumbwaiter.  Freeman and Wilcox were both disciplined and terminated from ISP shortly thereafter.

Sink filed this lawsuit in November 2012.  In December 2012, a note was found threatening Sink with assault and rape.  Sink was then reassigned to the JBU.  Sink's petition alleged sexual harassment and retaliation.  Defendants were granted summary judgment on the retaliation claim.  The sexual

harassment claim proceeded to jury trial. The jury returned a defense verdict. Sink now appeals.

## II. Sexual Harassment

Sink first claims the sexual harassment verdict was contrary to law, was unsupported by sufficient evidence, and did not effectuate substantial justice. Her motion for new trial was denied. Our review is for abuse of discretion. *See Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 326 (Iowa 1996). When a party challenges the sufficiency of the evidence supporting the jury's factual findings, we view the evidence in the light most favorable to the verdict, taking into consideration all reasonable inferences the jury may have made. *See City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*, 617 N.W.2d 11, 16 (Iowa 2000). "Courts have no right to set aside a jury verdict through mere caprice or whim, or to reweigh the evidence submitted, or to sit in judgment on the credibility of witnesses." *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 144 (Iowa 1996). Precedents are of little value because "[e]ach case must be decided by relating its own unique circumstances to the general principles" stated above. *Kalvik ex rel. Kalvik v. Seidl*, 595 N.W.2d 136, 140 (Iowa Ct. App. 1999).

The jury returned a verdict in favor of ISP. Sink filed a motion for new trial. The district court denied the motion and stated in part: "Plaintiff put on a strong case. It is hard to believe that ISP and DOC repeatedly allowed sexually graphic movies to be shown to inmates in the wing of the prison that housed sex offenders and mentally ill inmates. The undersigned would not have been surprised had the jury returned a sizable plaintiff's verdict."

Notwithstanding, we cannot say the district court abused its discretion in denying plaintiff's motion for new trial. There is significant evidence to support defendants' case as well. Much of the State's evidence attempted to show that all correctional officers, regardless of sex, were subject to hostile behavior from inmates. Other officers of both sexes testified to complaining about the movies shown or not wanting to watch such movies. The State also presented evidence that it took prompt and appropriate corrective action to end harassment; this included evidence involving the terminations of correctional officers Freeman and Wilcox, as well as evidence of inmate discipline. It would not be unreasonable for a fact finder to conclude plaintiff had not proved her case. The district court was in a position to observe the arguments presented by both sides. Its ruling on the motion for new trial does not constitute an abuse of discretion.

## III. Retaliation

Sink next claims the district court erred in dismissing her retaliation claim at the summary judgment stage. Our review is for correction of errors at law. *Campbell v. Delbridge*, 670 N.W.2d 108, 110 (Iowa 2003). Evidence is viewed in the light most favorable to the nonmoving party. *Estate of McFarlin v. State*, 881 N.W.2d 51, 56 (Iowa 2016).

To establish a prima facie case of retaliation under the Iowa Civil Rights Act, a plaintiff must show (1) she was engaged in statutorily protected activity, (2) the employer took adverse employment action against her, and (3) there was a causal connection between participation in the protected activity and the adverse employment action taken. *See Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006). Adverse employment action is "an action that detrimentally affects

the terms, conditions, or privileges of employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employee are not adverse employment actions." *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 862 (Iowa 2001).

Sink alleges several adverse actions, including: being subjected to investigation by her employer, being threatened with discipline by her employer, being issued a reprimand (later withdrawn) by her employer, being threatened by inmates, losing sick leave, receiving a downgrade of a performance review, losing her authority to turn off the common television, ISP's choosing to play animated films for prisoners, and changing her shift assignment to a less desirable one. "When a motion for summary judgment is properly supported, the nonmoving party is required to respond with specific facts that show a genuine issue for trial." *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 245 (Iowa 2006). Because the State's motion for summary judgment was properly supported, we look to Sink to set forth specific facts showing a genuine issue for trial. We address these allegations in turn.

While her employer may have investigated, disciplined, and reprimanded Sink, "formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions." *Thomas v. State of Iowa Child Support Collections*, No. 08-0722, 2008 WL 5484349, at *5 (Iowa Ct. App. Dec. 31, 2008) (citing *Singletary v. Mo. Dep't of Corrs.*, 423 F.3d 886, 891 n.5 (8th Cir. 2005)). No such "additional" disciplinary action has been alleged, so we cannot conclude these actions constitute adverse employment actions.

Sink alleges threats from inmates. We obviously do not condone the treatment Sink received from inmates, but we would not say it constitutes *employer* action. *See Boyle*, 710 N.W.2d at 750 (requiring action by employer to show adverse employment action).

Sink was asked to use sick time while the State investigated her workers' compensation claim that arose when the inmate threw urine on her. This was consistent with ISP policy. When she returned to work, the sick time she used was credited back to her. We find this was not an adverse employment action. *See Channon*, 629 N.W.2d at 862.

Sink claims a performance review of hers was lost and then replaced by a less favorable one as retaliation for a complaint she made about a supervisor's response to her sexual harassment claims. There is no evidence beyond Sink's claims to support this allegation. In fact, the performance reviews in the record are positive, rating Sink as meeting or exceeding expectations in every facet of her job. Nor is there any suggestion Sink suffered any negative consequences as a result of the alleged retaliatory review. *See Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 742 (Iowa 2003); *Channon*, 629 N.W.2d at 862. This allegation does not create a genuine issue for trial.

Sink misstates the record when she alleges she was "the only corrections officer denied the authority to turn off the television or switch channels." It is true she was directed to not turn off the television. However, this appears to be in the nature of a suggestion based upon legitimate safety and security concerns. It does not appear to be a prohibition. In any event, this alleged adverse action did not cause any materially significant disadvantage to Sink. *See Devin v.*

*Schwan's Home Serv., Inc.*, 491 F.3d 778, 785 (8th Cir. 2007) (stating "retaliatory actions must be material, producing significant rather than trivial harm"), *abrogated by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011); *Channon*, 629 N.W.2d at 862.

We are likewise unpersuaded by Sink's other allegations. In sum, there are no genuine issues of material fact Sink has alleged. The district court did not err in granting summary judgment on the issue of retaliation.

## IV. Evidentiary Issue

Sink challenges the district court's refusal to admit Exhibit 105; instead, it admitted a redacted version labeled Exhibit 105A. We review decisions to exclude evidence for abuse of discretion. *Johnson v. Knoxville Cmty. Sch. Dist.*, 570 N.W.2d 633, 640 (Iowa 1997). Reversal is not required "unless a substantial right of the party is affected." *Mohammed v. Otoadese*, 738 N.W.2d 628, 633 (Iowa 2007) (quoting Iowa R. Evid. 5.103(a)).

Exhibit 105 is a record of the investigation into Sink's discrimination complaint against the DOC. Exhibit 105 contains some references to the alleged adverse employment actions referenced above. Defendants objected to its admission. Because Sink's retaliation claim was dismissed at the summary judgment stage, the district court sustained the objection, ruling that references to the alleged adverse actions were irrelevant and unduly prejudicial. The exhibit was redacted to remove such references and admitted as Exhibit 105A. We find no abuse of discretion.

### V. Jury Instruction

Finally, Sink challenges a jury instruction. We review such challenges for correction of legal error. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707–08 (Iowa 2016). "Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *Id.* at 707. Sink requested the following instruction:

> Prisoners have no right to television, movies, or any particular entertainment, especially entertainment that is pornographic, sexually explicit, or violent in nature. Prison inmates do retain some rights to written materials under the First Amendment to the United States Constitution; however, those rights are secondary to the rights of prison employees to a work environment free from sexual harassment.

Instead, the court gave this instruction:

> Inmates retain some other constitution [sic] rights as long as they are not inconsistent with their status as prisoners or legitimate prison management objectives of the corrections system. A prison may adopt rules or regulations that restrict inmates' constitutional rights as long as they are reasonably related to legitimate interests of prison management. The prison must consider whether accommodation of inmates' rights will have an impact on prison guards and other inmates when deciding any restrictions.

Neither instruction correctly and completely sets forth the law. It is not true, as Sink would have it, that prisoners retain *no* right to unwritten entertainment. *See Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country."); *see also, e.g.*, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) (holding ordinance banning all nudity in films "broader than permissible"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 506 (1952) (holding unconstitutional a ban of a film "on the basis of a censor's conclusion that it is 'sacrilegious'"). But the given instruction falls short by not specifying with particularity which rights prisoners

retain or under what circumstances retention of those rights would be inconsistent with their status as prisoners. *See Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."); *see also Murchison v. Rogers*, 779 F.3d 882, 888–89 (8th Cir. 2015) (holding regulation censoring materials that promoted, incited, or advocated violence, disorder or the violation of state or federal law was reasonably related to legitimate penological interest); *Dean v. Bowersox*, 325 Fed. Appx. 470, 472 (8th Cir. 2009) (noting maintaining a controlled and secure environment is a legitimate penological interest); *Dawson v. Scurr*, 986 F.2d 257, 260–61 (8th Cir. 1993) (noting security and rehabilitation are legitimate penological interests). Other jurisdictions have explicitly included reducing sexual harassment of prison employees as a legitimate penological interest. *See Sperry v. Werholtz*, 413 Fed. Appx. 31, 40 (10th Cir. 2011); *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999); *Smith v. Fabian*, No. 10-2193, 2012 WL 1004982, at *6 (D. Minn. Mar. 26, 2012). The instruction given misled the jury. *See Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009). We therefore reverse and remand for new trial.

### VI. Conclusion

For the foregoing reasons, we affirm the judgment of the district court as it relates to Sink's retaliation claim. Because we find error with the jury instruction given, we reverse and remand for new trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL.**