# United States Court of Appeals
## For the Eighth Circuit
_____

No. 21-2894
_____

Raymond Redlich; Christopher Ohnimus

*Plaintiffs - Appellants*

v.

City of St. Louis, a municipality and political subdivision of the State of Missouri

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: June 16, 2022
Filed: October 12, 2022
_____

Before LOKEN and KELLY, Circuit Judges, and MENENDEZ,[1] District Judge.
_____

MENENDEZ, District Judge.

Appellants, Pastor Raymond Redlich and Christopher Ohnimus, commendably distribute food to homeless people in the City of St. Louis and wish to continue doing so as part of their charitable and religious practice. In October

_____

[1]The Honorable Katherine M. Menendez, United States District Judge for the District of Minnesota, sitting by designation.

2018, a St. Louis police officer observed Appellants distributing bologna sandwiches and issued each a citation for violating a city ordinance requiring a permit for the distribution of "potentially dangerous food." Although the City declined to prosecute the citations, Pastor Redlich and Mr. Ohnimus filed this suit, claiming that the City's enforcement of the ordinance violated their federal and state constitutional rights and Missouri statutes. The district court[2] granted the City's motion for summary judgment and declined to exercise supplemental jurisdiction over the state claims. We affirm.

I.

Pastor Redlich and Mr. Ohnimus are Christians who both live and work in the City of St. Louis. Pastor Redlich is the Vice President of the New Life Christian Evangelical Center, and Mr. Ohnimus is his assistant. Both Pastor Redlich and Mr. Ohnimus believe it is their religious duty to provide food, drink, and spiritual support for those in need, and particularly for the City's homeless population.

On October 31, 2018, Appellants distributed bologna sandwiches and bottled water to hungry people that they encountered in St. Louis. Though they sometimes also shared religious literature with the recipients of the food, they did not do so that day. St. Louis Police Officer Stephen Ogunjobi saw Appellants passing out the sandwiches and approached them. Officer Ogunjobi cited Appellants for distributing food without a permit in violation of the St. Louis Food Code. In his incident report, Officer Ogunjobi noted that Appellants passed out sandwiches stored in a cooler with no ice.

---

[2]Nannette A. Baker, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

At the time Appellants received these citations, St. Louis Ordinance No. 68597 ("the Ordinance") contained the provisions relevant to this appeal.[3] The Ordinance places restrictions on the distribution of "potentially hazardous food."[4] For example, "[t]he preparation or service of . . . sandwiches containing MEAT, POULTRY, EGGS, or FISH is prohibited" by temporary food establishments. For those seeking to distribute other potentially hazardous foods on a temporary basis, a temporary food permit is required, which costs $50 for each day of operation, and must be applied for more than 48 hours before the event. In addition, the operation must have a hand-washing station for employees; several food-grade washtubs; and enough potable water available for food preparation, cleaning of utensils and other equipment, and for hand washing.

Consistent with the instructions on their citations, Appellants appeared at the City's municipal courthouse on December 4, 2018. They met with attorneys in the City Counselor's Office, who informed them the City would not pursue the citations.

---

[3]The Ordinance was adopted March 16, 2010, and remained in effect until April of 2020, when it was repealed and superseded by a new ordinance.

[4]The term "potentially hazardous food" in the Ordinance is drawn from the 2009 Edition of the National Food Code published by the U.S. Department of Health and Human Services, Public Health Service, and Food and Drug Administration. "'Potentially hazardous food' means a food that requires time/temperature control for safety (TCS) to limit pathogenic microorganism growth or toxin formation," and specifically includes raw or heat-treated animal foods. FDA Food Code 2009, Ch. 1, § 1-201.10(B) (Potentially Hazardous Food definition, subparagraphs (1)–(2)(a)). It excludes, for example, hard-boiled eggs in the shell, foods packaged in hermetically sealed containers and prepared under sterile conditions, and foods that have been handled to prevent the growth of toxins and microorganisms. *Id.* (Potentially Hazardous Food definition, subparagraph (3)). More recently, in the 2017 Edition of the National Food Code, the term "potentially hazardous foods" was replaced with the term "time/temperature control for safety food," but its meaning remains the same. FDA Food Code 2017, Ch. 1, § 1-201.10(B) (Time/Temperature Control for Safety Food definition).

Later that day, the City's Public Safety Director publicly stated that issuing citations to those feeding the homeless was not a priority.

Just over one month after the City elected not to pursue the citations, Appellants filed this action. They alleged that, as applied to them, the St. Louis Food Code violates their First Amendment rights under the Free Exercise and Free Speech Clauses and sought both declaratory and prospective injunctive relief. While the litigation was pending in the district court, the City amended the St. Louis Food Code on two occasions. First, on April 18, 2020, the City enacted Ordinance No. 71106 ("the 2020 Ordinance"). The 2020 Ordinance introduced a Charitable Feeding Temporary Food Permit, at a reduced cost, and a Temporary Food Safety Training Program designed for those who wished to help feed the public free of charge. Just after the briefing was complete on the parties' summary judgment motions, the City amended the St. Louis Food Code again, enacting Ordinance No. 71324 ("the 2021 Ordinance") on February 23, 2021. The 2021 Ordinance, which remains in effect today, adopted several chapters of the 2017 Edition of the National Food Code, and retained the Charitable Feeding Temporary Food Permit and Temporary Food Safety Training Program.

The district court granted the City's motion for summary judgment and denied the Appellants' cross-motion for partial summary judgment. *Redlich v. City of St. Louis*, 550 F. Supp. 3d 734 (E.D. Mo. 2021). The court found that although the 2020 and 2021 amendments to the St. Louis Food Code post-dated Appellants' conduct, their claims were not moot because there remained "a credible threat of present or future enforcement against [Appellants]." *Id.* at 749. However, the court concluded that Appellants could not prevail on their First Amendment free-exercise claim, *id.* at 750–54, speech claim, *id.* at 754–59, or hybrid-rights claim, *id.* at 761–62. This appeal followed.[5]

---

[5]The district court also granted summary judgment to the City on Appellants' claim that the regulation violated their freedom to associate under the First Amendment and their right to equal protection under the Fourteenth Amendment,

-4-

II.

"We review the district court's grant of summary judgment de novo, drawing all reasonable inferences, without resort to speculation, in favor of the non-moving party." *Wilson v. Miller*, 821 F.3d 963, 967 (8th Cir. 2016) (quoting *Carrington v. City of Des Moines*, 481 1046, 1049 (8th Cir. 2007)). "Summary judgment is appropriate only if the moving party satisfies its burden of demonstrating that no genuine issues of material fact remain for trial." *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015).

A.

Pastor Redlich and Mr. Ohnimus appeal the summary judgment decision in favor of the City on their claim that the Ordinance violates their rights under the Free Speech Clause of the First Amendment. They assert that the City's enforcement of the Ordinance against them interferes with their ability to communicate their message about God's love and concern for those in need. We affirm the district court's disposition of this claim.

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. In addition to protecting "the spoken or written word, . . . conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)).

---

*id.* at 759–61, but Appellants have expressly waived those issues on appeal. Appellants' Br. 24. The district court's determination that it should not exercise supplemental jurisdiction over the Appellants claims under the Missouri Constitution and the Missouri Religious Freedom Restoration Act is also not before us. *Id.* at 763.

To decide whether conduct is sufficiently imbued with communicative elements to be protected, courts ask "whether '[a]n intent to convey a particularized message was present and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (alterations in original) (quoting *Spence*, 418 U.S. at 410–11). A person's intent to express an idea through conduct cannot alone bring that conduct within the First Amendment's protection of speech. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65–66 (2006) (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)); *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 957 (8th Cir. 2019) (citing *Masterpiece Cakeshop, Ltd. v. Col. Civ. Rights Comm'n*, 138 S. Ct. 1719, 1742 (2018) (Thomas J., concurring in part and concurring in the judgment)). "Instead, [the Supreme Court] ha[s] extended First Amendment protection only to conduct that is inherently expressive." *Rumsfeld*, 547 U.S. at 66.

Even where a person's conduct is inherently expressive, and may, therefore, be considered speech, a governmental regulation that restricts the ability to engage in the expressive behavior does not necessarily violate the First Amendment. *O'Brien*, 391 U.S. at 376. "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* A regulation does not violate a person's freedom of expression under the following circumstances:

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377; *see Telescope Media Gr. v. Lucero*, 936 F.3d 740, 756 (8th Cir. 2019) (stating that if "the government seeks to neutrally regulate the non-speech element [of a person's conduct], intermediate scrutiny applies under the incidental-burden doctrine").

Appellants do not suggest that the City lacks the constitutional power to enact the Ordinance, nor do they contend that the City's interest in preventing the spread of foodborne illness is related to suppression of free expression. Instead, Appellants argue that the Ordinance does not further an important or substantial government interest and that the Ordinance is not sufficiently tailored to the asserted interest. We disagree. Appellants' expressive-conduct claim fails because, even assuming that the conduct at issue is sufficiently communicative to fall within the First Amendment's purview, the Ordinance satisfies the test set forth in *O'Brien*.[6]

First, we reject Appellants' suggestion that the City failed to show that its asserted interest is a substantial one. Both common sense and the record say otherwise. It is an imminently reasonable proposition that a municipality has a substantial interest in preventing the spread of illness or disease among its citizens, including its homeless population. And the evidence before the district court belies Appellants' claim that the City failed to make an adequate showing with respect to the interest served by the Ordinance. The City introduced evidence that it has traced incidents of illness among its homeless population to illegally distributed food dating back to 2012. The City also pointed to CDC data indicating that nationally, in 2018 alone, nearly 6,000 people were hospitalized and 120 people died due to foodborne illness.

Appellants argue that several "data points" undercut the importance of the City's interest in preventing foodborne illness. For example, Appellants point to the decision not to pursue the citations and the Director of Public Safety's December 4, 2018, statement that issuing such citations was not a priority for the City. These details do not undermine our conclusion. The Director's press release downplayed the importance of criminal enforcement of the Ordinance, but it reinforced the regulation's goal "to prevent people from contracting a dangerous foodborne

---

[6]The district court similarly found it unnecessary to decide whether Appellants' conduct was inherently expressive because the Ordinance does not violate their right to free expression under *O'Brien*. *Redlich*, 550 F. Supp. 3d at 757–59.

illness." That same municipal goal is reflected in Officer Ogunjobi's incident report, which stated that health department officials asked "officers . . . to identify individuals who are breaking the rules, so they can follow-up and bring them to compliance." And on this record, the City Counselor's Office's decision to forego prosecution of the citations similarly appears to have been based on a choice to prioritize obtaining compliance over criminal enforcement, not a tacit admission that prevention of foodborne illness is an insubstantial concern.[7]

In addition to finding that the City's interest is substantial, we conclude that the Ordinance furthers that interest and is narrowly tailored to it. To satisfy the *O'Brien* standard "a regulation need not be the least speech-restrictive means of advancing the Government's interests. Rather, the requirement of narrow tailoring is satisfied, so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (cleaned up).

As noted above, the Ordinance adopted the 2009 Edition of the National Food Code, which is based on scientific research and was intended to provide municipalities with guidelines and rules to limit risk factors known to cause

---

[7]Appellants also suggest that the City's interest is not substantial because the regulation does not require a permit if a person shares potentially hazardous foods at a potluck or dinner party, but this argument is far afield from their as-applied challenge. Moreover, it rests upon a flawed reading of the Ordinance. If the potluck or dinner party were in a private space, the person would not be subject to the permitting and other requirements of the Ordinance even if potentially hazardous food were shared with family members and friends. But if such an event involves distribution of potentially hazardous food to the public, the Ordinance's requirement for a permit and its other provisions would be applicable. The Ordinance applies to "Temporary Food Establishments," which are a form of "Food Establishment" under the 2009 Edition of the National Food Code. FDA Food Code 2009, Ch. 1, § 1-201.10(B) (Temporary Food Establishment definition). A "Food Establishment" is, in turn, an operation that "stores, prepares, packages, serves, [or] vends food directly to the consumer." *Id.* (Food Establishment definition subparagraph (1)(a)). And a "consumer" is "a person who is a member of the public." *Id.* (Consumer definition).

foodborne illness. The City offered evidence that food contaminated by pathogenic microorganism growth and toxin formation causes foodborne illness. The same criteria determine how the National Food Code defines "potentially hazardous food." And, in turn, the Ordinance identifies sandwiches containing meat, poultry, eggs, or fish as among those foods considered to be potentially hazardous. As applied to Appellants, the Ordinance furthers the City's important interest in preventing the spread of foodborne illness by regulating the distribution of potentially hazardous food—namely, sandwiches containing bologna.

The Ordinance requires Appellants to obtain a permit and meet other requirements only if they distribute potentially hazardous food,[8] and imposes such conditions because they are effective at preventing the spread of foodborne illness. To distribute potentially hazardous food on a temporary basis, Appellants would be

---

[8]In their briefing and at oral argument, Appellants asserted that the City would place onerous restrictions on their food-sharing activities even if they were to distribute only pre-packaged, ready-to-eat food that was not potentially hazardous. Appellants' Br. 13; Appellants' Reply 10–11. Appellants point to the Ordinance's definition of a "Mobile Food Establishment," which includes packaged-food distributors using vehicles that serve only pre-packaged, "ready-to-eat FOOD or drink and/or whole, uncut fruit and/or vegetables from an APPROVED source." Ordinance No. 68597, Ch. 1 (Mobile Food Establishment definition subparagraph (3)). This does not change the outcome here. Under the Ordinance, a Mobile Food Establishment is itself a "Food Establishment," which, in turn, is defined as an operation that serves "potentially hazardous foods." *Id.*, Ch. 1 (Food Establishment definition subparagraph (1)(c)). But more importantly, nothing in the record suggests that Appellants were cited for violating the Mobile Food Establishment rules, nor that they received a citation for distributing food items that do not meet the definition of "potentially hazardous food." And Appellants provide no reason to conclude that under the version of the St. Louis Food Code currently in effect, they are likely to be prosecuted if they pass out food that is not potentially hazardous. This is, after all, an as-applied challenge to the Ordinance, and Appellants have not alleged that the regulation is (or would likely be) applied to them in this manner. *See McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014) ("[A] plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him.").

required to pay a $50 fee for the permit at least two days in advance of their food-sharing activities and notify the City of both the time and place where the food would be distributed. These provisions ensure that health inspectors have an opportunity to determine whether the temporary food establishment is complying with the Ordinance. When operating a temporary food establishment, Appellants would also have to ensure: that they take steps to prevent contamination of any ice served to consumers; that tableware provided to consumers is only in single-service and single-use articles; that any equipment is located and installed in a way that avoids food contamination and to facilitate cleaning; that food-contact surfaces are protected from consumer contamination; and that they have water available for cleaning utensils and equipment and to make convenient handwashing facilities available for any employees. Without these provisions regarding the distribution of potentially hazardous food to the public, the City's goal of preventing foodborne illness would be achieved less effectively.

Moreover, we note that nothing about the City's enforcement of the Ordinance against Appellants prevents them from conveying their religious message in other ways. *Cf. Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 298 (1984) (explaining that time, place, and manner restrictions on expression are valid where, among other things, they "leave open ample alternative channels for communication of the information" and noting that the *O'Brien* test is "little, if any, different from the standard applied to time, place, and manner restrictions"). For example, Appellants may continue engaging in the allegedly expressive act of sharing non-hazardous food with those in need while simultaneously discussing the substance of their message with them or with passersby, sharing literature, or engaging in other protected speech. Enforcement of the Ordinance against Appellants for the distribution of potentially hazardous food limits none of those alternative avenues of expression.

We affirm the district court's entry of summary judgment in favor of the City on Appellants' freedom-of-expression claim.

B.

Appellants also argue that the City was not entitled to summary judgment on their hybrid-rights claim under *Department of Human Resources v. Smith*, 494 U.S. 872 (1990). Appellants claim that because they asserted both a Free Exercise claim and a freedom-of-expression claim, the district court erred by refusing to apply strict scrutiny to their hybrid-rights claim. We disagree. Appellants concede that they do not have a viable claim under the Free Exercise Clause, and their expressive-conduct claim lacks merit. Because each of the claims making up their hybrid-rights claim "fails on its own, . . . this case is not in the class of hybrid situations in which the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech, can bar application of a neutral, generally applicable law." *B.W.C. v. Williams*, 990 F.3d 614, 622 (8th Cir. 2021) (quotation omitted).

The judgment of the district court is, therefore, affirmed.

_____